UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 7:14-CV-61-D

| | | |
|---|---|---|
| VICTORIA GALBREATH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| v. | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| TIME WARNER CABLE INC., | ) | |
| | ) | |
| Defendant. | ) | |

Defendant Time Warner Cable Inc. ("Defendant" or "TWC") submits this Memorandum in Support of Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## NATURE OF THE CASE

Plaintiff Victoria Galbreath ("Plaintiff" or "Galbreath") filed this action to recover statutory damages under the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA"), for calls TWC made to her cell phone regarding her brother's past due account at TWC. In opening an account with TWC, Galbreath and her brother provided TWC with Victoria Galbreath's cell phone number and expressly consented to receiving past due reminder calls to her cell phone without any right to opt out of such calls. Galbreath also agreed TWC could make these calls using a dialing system and/or an artificial or pre-recorded voice.

Galbreath's claims fail as a matter of law because her prior express consent to be called is a complete defense under the TCPA. The TCPA and her agreement with TWC afford no right to revoke such consent, and Galbreath in any event waived revocation by continuing to accept and use TWC's services under the agreement. Further, TWC did not call Galbreath using an "automatic telephone dialing system" ("ATDS") as defined by the TCPA, and the calls fall

outside the scope of the TCPA because they were not sent in bulk, randomly, or for telemarketing purposes. There are no geniuine issues of material fact, and TWC is entitled to summary judgment on Plaintiff's claims.

**STATEMENT OF THE FACTS**

*Galbreath Agreed To Receive "Past Due" Reminder Calls From TWC To Her Cell Phone*

The relationship between TWC and all of its residential customers is a contractual one governed by the TWC Residential Services Subscriber Agreement ("RSSA"). Decl. of David Zitko ("Zitko Decl.") ¶ 13, Ex. 1. Pursuant to the RSSA, residential subscribers such as Galbreath agree to receive informational calls from TWC, including through the use of artificial or pre-recorded voices. The RSSA allows customers to opt out of telemarketing calls, but provides no corresponding right to opt out of receiving informational calls while receiving TWC services. Informational calls include reminders regarding past due payments. Specifically, the RSSA provides:

> **12. You are Consenting to Phone and Email Contact**
>
> (a) Phone Calls. We may call or text you or authorize others to call or text you on our behalf using any number you provide to us (or that we issue to you) for any purpose, including marketing of our Services.…However, if you ask to have your number placed on our "do not call" list, we will not call or text you (or authorize others to call or text you) at that number for marketing purposes. To have your number placed on our "do not call" list, contact your local TWC office.
>
> (b) Robo-Calls. We (or persons acting on our behalf) may use automated dialing systems or artificial or recorded voices to contact you or leave you messages if you do not answer.

*Id.*, Ex. 1. When Galbreath signed up for TWC's services, she provided TWC with the cell phone number that is at issue in this case. *Id.* ¶ 15.

The RSSA also requires customers to pay their bills on time. *Id.*, Ex. 1 § 1. In 2010, Victoria Galbreath opened an account with TWC for cable service at her residence in Maxton,

North Carolina. She failed to pay her bills, and TWC terminated her account in April 2012. Her account has an outstanding balance of $291.19. *Id.* ¶ 13. In December 2013, Tevin Galbreath (or someone purportedly acting on his behalf) opened an account with TWC for cable service at a residence in Red Springs, North Carolina. The person opening Tevin Galbreath's account provided TWC with a cell phone number for purposes of being contacted regarding the account. Upon information and belief, the cell phone number provided to TWC belonged to Victoria Galbreath. *Id*. ¶ 15.

According to Galbreath, she instructed TWC to no longer call her cell phone during a conversation sometime in February 2014. Compl. ¶ 9. Beginning on February 1, 2014, and ending on March 20, 2014, TWC called Victoria Galbreath's cell phone regarding past due payments on the account. Someone answered the calls three (3) times: on February 1st, March 5th, and March 11th. *Id*. ¶ 16. TWC left a message on Galbreath's voicemail on ten (10) occasions: February 4, 7, 11, and 13; and March 1, 5, 8, 13, 15, and 17. Zitko Decl. ¶ 16. TWC also attempted to reach Galbreath on twelve other occasions, but was unsuccessful and did not leave a message. *Id.* ¶ A person using Galbreath's cell phone called TWC fifteen times regarding the account between February 1, 2014, and March 20, 2014. *Id*. ¶ 18.

*TWC's Outbound Enterprise IVR*

TWC maintains a centralized function for contacting TWC residential customers to remind them about past due balances. *Id.* ¶ 3. TWC calls only phone numbers provided by its customers. *Id.* ¶ 4. Since at least May 2013, TWC has used its own proprietary dialing system called the Outbound Enterprise IVR (the "IVR"). The IVR is a software application housed on servers owned and operated by TWC and connected to phone lines used by TWC. *Id.* ¶ 3. The

IVR is the only dialing system TWC uses to make payment reminder calls to its active customers regarding past due balances. *Id.*

The IVR is integrated with TWC's billing system, which is the repository for all information that TWC maintains about its customers. *Id.* ¶ 5. The billing system contains the services that the subscriber receives, the amounts that are billed, the amounts that are paid, the customer's name, address and phone number and other relational issues. Each day, the IVR reviews the billing system to identify past due accounts and calls the phone numbers associated in the billing system with those accounts (as provided by TWC customers). *Id.* If a call is not answered and there is an opportunity to leave a voice message, the IVR sometimes leaves a voice message along the lines of:

> This is Time Warner Cable with an automated message about an important change in the status of the account belonging to [account holder's name]. Please call us back within the next 24 hours at 1-800-xxx-xxxx. Again, that's 1-800-xxx-xxxx. Thank you.

*Id.*

If the call is answered, the IVR plays a message and gives the customer the option to proceed with the calls, including making a payment through TWC's IVR system. The message states, to the effect of:

> Hello, this is Time Warner Cable with an automated message about an important change in the status of your account. [] If I'm speaking with [account holder's name], press 1. If they're available to come to the phone, press 2. If they can't come to the phone right now, press 3.

*Id.* ¶ 6. There are four versions of this message, which are all substantially similar. The IVR plays a particular message based on how long the customer being called has maintained a past due balance and whether the IVR is warning the customer of possible disconnection of his or her service. *Id.*

If someone presses "1" to verify he or she is a TWC customer, the IVR will play another message, stating, to the effect of:

> Time Warner Cable would like to inform you that your account is past due. To avoid future collections activity, you'll need to pay your full balance of [] or your past due amount of []. To pay your full balance now, press 1. To pay your past-due amount, press 2. If you've already made a payment, press 3. If you'd prefer to call us back within the next 24 hours, press 4. To hear this information again, press 5—or to speak to a representative now, press 0.

*Id.* ¶ 7. There also are four versions of this message, which are all substantially similar. The IVR plays a particular message based on how long the customer being called has maintained a past due balance and whether the IVR is warning the customer of possible disconnection of his or her service. *Id.*

The IVR places a maximum of three calls per day to a particular TWC customer between 9:00 a.m. and 9:00 p.m. local to the customer's geographic location. *Id.* ¶ 8. If someone answers the phone and presses "1" to verify that he or she is a TWC customer, the IVR will not make any more calls to the customer that day. If the customer does not answer the call and there is an opportunity for a voice mail message, the IVR will leave a maximum of one voice message per day. *Id.* ¶ 9.

The IVR was created by TWC employees, and it has never had the capacity to produce or store telephone numbers using a random or sequential number generator. *Id.* ¶ 10. Rather, the IVR calls only phone numbers stored in TWC's billing system (provided by TWC's customers) that are associated with a past due account. *Id.* Further, the IVR has never been a "predictive dialer." The IVR has never dialed telephone numbers in a manner that 'predicts'—based on complicated algorithms—when a call recipient will answer the telephone so a live call center agent will be available to take the call. *Id.* ¶ 11. The IVR only calls the phone numbers from

TWC's billing system, occasionally plays messages, and enables customers to interact with TWC's billing system through the IVR, including speaking with a live TWC representative. *Id.*

**ARGUMENT**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment is not "a disfavored procedural shortcut;" rather, it is an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Id*. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The TCPA does not prohibit outright the use of automated technology to place calls to cell phones. *See Emanuel v. L.A. Lakers, Inc.*, 2013 U.S. Dist. LEXIS 58842, at *8 (C.D. Cal. Apr. 18, 2013). Rather, the TCPA makes it unlawful to, among other things, "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice" to a cell phone. 47 U.S.C. § 227(b)(1)(A). Here, Galbreath's TCPA claims fail for three reasons: TWC had the prior express consent of Galbreath to call her on her cell phone, which she could not and did not revoke; TWC did not use an ATDS to call her; and the past due reminder calls fall outside the scope of the TCPA.

**I.     Galbreath Expressly Consented To Receiving Calls From TWC And Could Not Revoke Consent While Still Using TWC Services.**

"Prior consent is a defense to a claim under the TCPA." *Snow v. Global Credit & Collection Corp.*, 2014 U.S. Dist. LEXIS 157023, at *10-11 (E.D.N.C. Nov. 6, 2014) (citing 47 U.S.C. 227(b)(1)(A)(iii)). Galbreath consented to receiving TWC's calls, and she could not legally nor contractually revoke that consent, particularly while choosing to remain a TWC customer and receiving the benefits to which she was entitled under the RSSA.

**A.     TWC Had Galbreath's Prior Express Consent To Call Galbreath, Which Is A Complete Defense Under The TCPA.**

Galbreath's Complaint admits TWC had her express consent to call her cell phone. Compl. ¶ 13. Indeed, merely providing a cell phone number to a creditor constitutes consent to be called at that number. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C.R. 559, 564 ¶ 10 (F.C.C. Jan. 4, 2008); *see also Saunders v. NCO Fin. Sys.*, 910 F. Supp. 2d 464, 468 (E.D.N.Y. 2012) ("Nothing compels a consumer to list his cell phone number with his counterparty when he opens an account, or to open an account at all, but if that is the number he chooses to provide, then he cannot complain about being called at that number."); *Pinkard v. Wal-Mart Stores, Inc.*, 2012 U.S. Dist. LEXIS 160938, at *14 (N.D. Ala. Nov. 9, 2012) ("To hold otherwise would contradict the overwhelming weight of social practice: that is, distributing one's telephone number is an invitation to be called."). Galbreath not only provided her cell phone number to TWC; she also expressly consented to being called on her cell phone when she agreed to accept services from TWC under the terms of the RSSA. Zitko Decl., Ex. 1 ¶ 12.

## B. Galbreath Could Not Revoke Her Prior Express Consent.

No genuine issue of material fact exists regarding Galbreath's alleged revocation of consent for TWC to call her cell phone because she could not revoke consent under the TCPA or the RSSA.

### 1. Unlike Other Consumer Protection Statutes, The TCPA Contains No Revocation Right.

On similar facts, federal district courts have held that consumers have no right under the TCPA to revoke express consent. *See Chavez v. Advantage Grp.*, 959 F. Supp. 2d 1279, 1282-83 (D. Colo. 2013) (plaintiff's attempt to revoke consent to be called was ineffective under the TCPA because there is no revocation right in the TCPA); *Kenny v. Mercantile Adjustment Bureau, LLC*, 2013 U.S. Dist. LEXIS 62415, at *19-20 (W.D.N.Y. May 1, 2013) (same); *Saunders v. Nco Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 468-69 (E.D.N.Y. 2012) (same). As the *Saunders* Court explained:

> I see nothing in the TCPA that gives a consumer two bites at the apple. That is, there is no provision in the TCPA, unlike the [Fair Debt Collection Practices Act], that allows withdrawal of a voluntarily-given, prior express consent to call a cell phone number.
>
> It is not as if we are dealing with a fundamental constitutional right where a waiver may, under limited circumstances, be withdrawn. This is a narrow statutory right not to receive automated calls on a cellphone. A consumer that voluntarily gives it up need not have an opportunity to change his mind later; he has withdrawn from the protection of the statute.

*Saunders*, 910 F. Supp. 2d at 468-69 (internal citations omitted). The *Saunders* Court criticized cases holding to the contrary and declined "to read a substantive right into a statute when it is quite conspicuously missing." *Id.* at 460.

Galbreath gave prior express consent to TWC to call her cell phone to remind her that she had not made a payment to prevent her services from being interrupted. That consent was not

and could not be effectively withdrawn. TWC therefore is entitled to summary judgment on Galbreath's TCPA claims.

### 2. The RSSA Contains No Right To Revoke Consent To Receive Informational Calls.

Even if permitted by the TCPA, basic principles of contract law defeat Galbreath's claim of revocation. In signing up for TWC's services, Galbreath agreed to be bound by the RSSA, which affords customers the right to opt out of telemarketing calls, but not informational calls. Zitko Decl., Ex. 1 ¶ 12. This contractual limitation on revocation rights is enforceable. *See* WILLISTON ON CONTRACTS, Revocation, § 40:28, p. 106 (Parties "may establish, by agreement, limitations on the right to revoke."). The parties agreed in the RSSA that TWC's IVR could make informational calls to Galbreath, and Galbreath cannot accept the benefits afforded by the parties' contract while avoiding its burdens. *See, e.g.*, *Snyder v. Freeman*, 300 N.C. 204, 214, 266 S.E.2d 593, 600 (1980).

Additionally, Galbreath could not unilaterally change the terms of her agreement with TWC. "Parties to a contract may agree to change its terms; but the new agreement, to be effective, must contain the elements necessary to the formation of a contract." *NRC Golf Course, LLC v. JMR Golf, LLC*, 222 N.C. App. 482, 502, 731 S.E.2d 474, 480 (2012) (internal quotations omitted). Thus, modification of a contract requires an offer, acceptance, and consideration. *Burley v. U.S. Foods, Inc.*, 756 S.E.2d 84, 89 (N.C. Ct. App. 2014). These elements are not met. Galbreath alleges TWC expressly declined her request that TWC stop calling her. Compl. ¶ 10. Further, there is no evidence Galbreath offered or provided new consideration to TWC. *See Clifford v. River Bend Plantation, Inc.*, 312 N.C. 460, 466, 323 S.E.2d 23, 27 (1984) (agreement to modify the terms of a contract must be based on new

consideration). Accordingly, the parties did not modify the RSSA, and Galbreath was contractually bound to receive calls from TWC regarding her past due balance.

In addition, Galbreath waived her purported revocation by continuing to use TWC's services. *See*, *e.g.*, WILLISTON ON CONTRACTS § 40:30 ("[T]he buyer's actual use of the goods after asserting a right to revoke acceptance will operate to undo the revocation if the use is inconsistent with the seller's ownership. . . ."); *Computerized Radiological Services v. Syntex Corp.*, 786 F.2d 72, 75 (2d Cir. 1986) (continued use "at odds with a revocation of acceptance and could be held to have invalidated an earlier attempt at revocation"). Galbreath not only remained a customer of TWC after allegedly revoking consent to be called, she used her cell phone to call TWC fifteen times regarding her account. Zitko Decl. ¶ 18. Under these circumstances, she waived any attempted revocation of consent to be called by TWC. *See Hudson v. Sharp Healthcare*, 2014 U.S. Dist. LEXIS 87184 at *27 (S.D. Cal. June 25, 2014) (alleged revocation by plaintiff in TCPA case was ineffective because she later accepted and returned defendant's calls and "engaged in a cooperative dialogue" with defendant regarding her bill).

## II. TWC Did Not Call Galbreath With An ATDS.

Galbreath's Complaint alleges—in the alternative—that TWC called her not only using artificial or prerecorded voices, but also by using an ATDS. However, she has no evidence to create a factual dispute as to this issue, much less carry her burden of showing that the IVR is an ATDS. *See Buslepp v. Miami Improv, Inc.*, 2012 U.S. Dist. LEXIS 148527, at *6 (S.D. Fla. Oct. 16, 2012).

An ATDS is "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such

numbers." 47 U.S.C.§ 227(a)(1). Absent these capabilities, automated telephone technology is not an ATDS regulated by the TCPA. *Dominguez v. Yahoo, Inc.*, 2014 U.S. Dist. LEXIS 36542, at *17 (E.D. Pa. Mar. 20, 2014); *see also In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 27 FCC Rcd 15391, 15391 ¶ 2 n.5 (Nov. 29, 2012).

The ability of automated telephone technology to randomly or sequentially generate telephone numbers must be determined by the technology's actual capabilities at the time of use, i.e., the technology's "present capacity." *De Los Santos v. Millward Brown, Inc.*, 2014 U.S. Dist. LEXIS 88711, at *20 (S.D. Fla. June 30, 2014); *Gragg v. Orange Cab Comp., Inc.*, 995 F. Supp. 2d, 1189, 1192-1196 (W.D. Wash. Feb. 7, 2014). "'Random number generation' means random sequences of 10 digits, and 'sequential number generation' means (for example) (111) 111-1111, (111) 111-1112, and so on." *Gragg*, 995 F. Supp. 2d at 1193 (internal quotations omitted). If the automated technology, at the time it is used, lacks the capacity to store or produce random or sequential telephone numbers and to actually dial those numbers, it is not an ATDS under the TCPA regardless of whether the technology could theoretically be modified to allow those capabilities. *Id.*; *De Los Santos*, 2014 U.S. Dist. LEXIS 88711, at *20; *Hunt v. 21st Century Mortgage Corp.*, 2013 U.S. Dist. LEXIS 132574, at *11 (N.D. Ala. Sep. 17, 2013).[1]

The calls placed to Galbreath's cell phone were not and could not have been placed via an ATDS. TWC's IVR has never been able to generate random or sequential telephone

---

[1] A district court in the Ninth Circuit concluded earlier this year that a court may consider telephone technology's potential future technology in deciding whether it is an ATDS. *Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129, 141-43 (S.D. Cal. July 3, 2014). Other courts, including a different district court within the Ninth Circuit, have specifically considered and rejected the *Sherman* court's analysis, noting that it would subject 20 million iPhone users to the TCPA because they potentially could download an app to allow their iPhone to generate random or sequential telephone numbers. *Gragg*, 2014 U.S. Dist. LEXIS 16648, at *8; *Hunt*, 2013 U.S. Dist. LEXIS 132574, at *11; *see also Dominguez*, 2014 U.S. Dist. LEXIS 36542, at *19-20.

numbers. Zitko Decl. ¶ 10. Rather, the IVR calls only phone numbers stored in TWC's billing system (provided by TWC's customers). *Id.* The IVR allows TWC to attempt to communicate with a specified subset of customers for specific purposes. *Id.* The actual calls made to Galbreath were not randomly or sequentially generated by TWC. *Id.* ¶ 15.

In sum, TWC did not use an ATDS to call Galbreath, and TWC is entitled to summary judgment on Galbreath's TCPA claims on this basis. *See Dominguez*, 2014 U.S. Dist. LEXIS 36542, at *11-20. (system that stored cellular telephone numbers but did not randomly or sequentially generate them was not an ATDS; defendant entitled to summary judgment); *Gragg*, 2014 U.S. Dist. LEXIS 16648, at *7-10 (system that called telephone numbers provided by customers or captured by Caller ID did not randomly or sequentially generate numbers; because no ATDS used, defendant entitled to summary judgment); *Hunt*, 2013 U.S. Dist. LEXIS 132574, at *11 ("to meet the TCPA definition of an 'automatic telephone dialing system,' a system must have a **present** capacity, at the time the calls were being made, to store or produce and call numbers from a number generator").

### III. The Informational Calls to Galbreath Fall Outside The Scope Of The TCPA.

Cartette's claims also fail because the calls to her cell phone number were not sent in bulk, randomly, nor for advertising or telemarketing purposes, which are the harms section 227 of the TCPA seeks to address. "'In construing the extent and contour of [the TCPA], courts consistently and properly look to the purpose and history of the statute.'" *Emanuel*, 2013 U.S. Dist. LEXIS 58842, at *8 (quoting *Ryabyshchuck v. Citibank (S.D.), N.A.*, 2012 U.S. Dist. LEXIS 156176, at *5-6 (S.D. Cal. Oct. 30, 2012)). The U.S. Supreme Court has noted Congress enacted the TCPA to remedy "intrusive nuisance calls" and "certain practices invasive of

privacy." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).[2] Thus, "courts broadly recognize that not every [] call constitutes an actionable offense." *Ryabyshchuck*, 2012 U.S. Dist. LEXIS 156176, at *6. "[C]ontext is indisputably relevant to determining whether a particular call is actionable under the TCPA. *Id.* at *8-9.

It is undisputed Galbreath's phone received the calls because she gave TWC her cell phone number for purposes of contacting her about her account. TWC attempted to contact Galbreath (its customer) for the specific purpose of reminding her of her past due account and not for unsolicited advertising or telemarketing purposes. Consequently, the calls are not actionable under the TCPA. *See id.* at *7 (summary judgment for defendant because the limited nature of its contact with plaintiff "dispel any allusion to 'the proliferation of instrusive, nuisance calls'" targeted by the TCPA); *Ibey v. Taco Bell Corp.*, 2012 U.S. Dist. LEXIS 91030, at *8 (S.D. Cal. June 18, 2012) (summary judgment for defendant because imposing TCPA liability based on the limited nature of its contact with plaintiff "would contravene public policy and the spirit of the statute—prevention of unsolicited telemarketing in a bulk format").

## CONCLUSION

For the foregoing reasons, there are no genuine disputes of material fact, Defendant Time Warner Cable Inc. is entitled to summary judgment, and the Court should dismiss this matter with prejudice.

---

[2] In enacting the TCPA, Congress cautioned that it "d[id] not intend for this restriction to be a barrier to the normal, expected or desired communications between businesses and their customers." H.R. Rep. 102-317, at 17 (1991).

This the 27th day of March 2015.

                                          /s/ D.J. O'Brien III
D.J. O'Brien III
dobrien@brookspierce.com
N.C. State Bar No. 35481
BROOKS, PIERCE, MCLENDON,
HUMPHREY &  LEONARD, LLP
1600 Wells Fargo Capitol Center
150 Fayetteville Street
Raleigh, NC 27601
Tel. (919) 839-0300
Fax (919) 839-0304

CERTIFICATE OF SERVICE

The undersigned hereby certifies that he electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send electronic notification of the filing to the following:

>Ruth M. Allen
>rallen@lemberglaw.com
>*Attorney for Plaintiff*

This the 27th day of March 2015.

>/s/ D.J. O'Brien III
>D.J. O'Brien III